**Opinion filed December 22, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00196-CR

_____

## MANUEL LOUIS ROBINSON, Appellant

## V.

## STATE OF TEXAS, Appellee

On Appeal from the 54th District Court

McLennan County, Texas

Trial Court Cause No. 2009-528-C2

## MEMORANDUM OPINION

Manuel Louis Robinson appeals his conviction and sentence for capital murder. In four issues, appellant contends that the evidence was insufficient to prove that the murder was committed in the course of committing or attempting to commit a robbery, that the evidence was insufficient to establish that appellant intended to cause the death of the victim, that the submission of an erroneous instruction in the charge caused appellant egregious harm, and that the trial court's order that appellant repay the costs of appointed counsel was error. The State

agrees that the judgment should be modified to delete the assessment of those costs. We modify the judgment to delete the assessment of costs of counsel. As modified, we affirm.

*Background Facts*

Lupe White, the victim's wife, testified that she, the victim, and their son were watching a movie late in the evening of June 1, 2008. She fell asleep, but gunshots woke her. The lights were off, although they had been on when she went to sleep. Her son, Jameson, was shouting at her, sounding scared. She ran into him in the dark, and when she went out in the backyard, she saw someone dressed in black jumping over the fence. She also saw a charcoal gray car pulling out of the alley. She tripped over the victim's body at a back corner of their house.

Jameson testified that he was watching the movie but that his father sent him to bed. Shortly after he went into his room, the lights went off. The house was old, the breaker box was at the back of the house, and the lights often went off. Jameson used his Gameboy as a light so that his dad could see the fuse box. Usually, it was a fuse that went out; however, his father opened the box and said that the lever had been pulled. The lever had never been the problem, and his dad sent him inside for a flashlight. As he returned to the back door and looked through the screen, he heard gunshots and saw flashes of light from a semiautomatic weapon. Jameson said that he stayed inside and that Lupe came up behind him. He saw a man wearing dark clothes, who appeared to be African-American, running toward the alley. Jameson saw the man put his hands on the fence. They were black, but he acknowledged that the man could have been wearing gloves. Jameson also heard a car leave the alley and said that his mother found his dad at the left back corner of the house.

In describing the backyard area, Jameson said that a band room and beauty shop at the back of the property could be seen when one walks out on their back porch. The garage was between the back porch and the band room.

Doreen Mishele Walker lived next door and was watching a movie when she heard about five rapid-fire gunshots. She then heard Lupe's voice asking her to call 911, which she did. The victim's body was only about twenty feet from Walker's window. She commented that the alley was wide enough for a large car.

Officer Kenneth Carpenter and Officer Timothy James Bonovitch of the Waco Police Department were the first officers to arrive at the victim's house. Officer Carpenter said that they found several .223 cartridge casings, a .45 casing, and some blood spots at the scene. Based

2

on Officer Carpenter's military training, he knew that a .223 cartridge is used in the AR15. The officers found a buffer spring and part of a butt stock from an AR15, and Officer Carpenter explained that it would take a lot of force to break these parts off. Officer Carpenter testified that the .223 casings and the AR15 parts were found approximately four or five feet from where the victim lay. The .45 casing was found near a tree, approximately twenty feet from the victim. Blood spots were on the sidewalk in front of a building and near where the .223 casings and parts to the AR15 were found.

Doctor Tracy Dyer, a forensic pathologist with the Dallas County Medical Examiner's Office, testified that one gunshot entered the left side of the victim's chest, hit a number of vital organs, and then left deformed fragments of the bullet on the right side of the pelvic area. The path of the shot was downward. There was stippling on the victim's skin, indicating that the gun was very close to the victim. That would have been a fatal wound.

A second shot went from front to back, through the abdomen, and exited the right side of the back. A third shot left a superficial wound on the left side of the victim's abdomen; it was very sharply downward in its angle. And a fourth shot entered the right thigh and came out of the lateral backside of the right thigh.

Doctor Dyer said there also were a number of blunt force injuries to the victim: a laceration on the upper left side of his lip; a variety of abrasions on the forehead, nose, and face; and a bruise on his right ear. The blunt force injuries could have resulted from a struggle with his assailant. There was also soot on the victim's left forearm indicating that his arm got in the way of a gunshot.

Two other experts testified. One confirmed that the residues on the victim and the ripping and tearing of his clothing around the gunshot holes indicated that the victim was very near some of the gunshot discharges. The ripping and tearing was caused by the gas escaping from the weapon when it was discharged. The other forensic expert explained how he determined that all three .223 cartridge casings were fired from the same weapon. He also analyzed a fired bullet from a .45 caliber weapon that had lodged in the corner of the house near the victim.[1] On the night of the murder, the fired .45 casing was found about twenty feet from the victim. No matches were found for the .45 caliber casing in the National Integrated Ballistic

---

[1] The bullet was found in January 2010 by workmen working on leveling the victim's house. It was lodged in the wall at the corner near where the victim lay.

Information Network. The rifling of the gun that fired the bullet did not match anything in the FBI's Gun Rifling Characteristics Database.

Crime scene investigators also found a number of blood droplets at the crime scene. There was a trail of blood droplets toward the back fence that indicated the person who left them was moving in a northerly direction toward the alley. Blake Goertz, manager of the DNA section for the Texas Department of Public Safety Crime Lab in Waco, told the jury that he found that the DNA profiles of some of the droplets were consistent with the profile of the victim. DNA profiles of other droplets found on the concrete and shrubbery were compared with an offender database called CODIS, and those profiles were found to be consistent with the DNA profile of Raheem Watkins. On November 3, 2008, the lab received a known blood sample from Raheem that confirmed that his profile was consistent with the profile of the blood droplets found at the crime scene.

Marquita Lee Pordia is appellant's sister. At the outset of her testimony, she stated that she absolutely did not want to be a witness. On the evening of the murder, Marquita was at her now mother-in-law's house. Her husband, Carl Watkins, is known as Inky, and his mother is referred to as Pudding. Brittany Hamilton, appellant, and Raheem also were there. Brittany was dating appellant, and Marquita was fairly certain that they had a sexual relationship. Brittany was seventeen at the time.

Late in the evening, appellant asked Marquita if Brittany could ride with Marquita because he and Raheem were going to use Brittany's car to "go dirty legging." Raheem gave Marquita some gas money and some marihuana. Appellant and Raheem left in Brittany's car, which Marquita described as a gold Nissan Altima. Brittany, Brittany's infant son, and Marquita left in Marquita's car. Marquita testified that, while she was at the gas station, she saw Brittany's car go by, but did not see who was in the car. She did not remember telling Detective Steve January that she had seen her brother and Raheem in the car. At some point, Marquita's car broke down on 16th or 17th Street.

While Marquita was waiting there, appellant drove up without Raheem and asked Brittany to take him home. Marquita admitted that she told Detective January, when she came in at Detective January's request in 2009, that her brother told her that night that he had "f----d up" and that he was fixing to go. She also admitted that she asked him, "Where you fixing to go?" At trial, she claimed that she just told Detective January that appellant had made the statement to

4

her because she was scared and needed to get home to her kids but that appellant had not made the statement. She admitted that no one made her come in to talk with Detective January and that she knew she was free to go at any time.

Marquita testified that it was Inky who gave Brittany some pills to take to Raheem at Jenequehua Scott's apartment in the Lake Shore North Apartments. She claimed that the hydrocodone pills were for Raheem to get high and that her brother had not told her that Raheem had been shot in the foot that night and needed pills for pain. She admitted at trial that she went with Brittany to Jenequehua's apartment, but said that she did not go in.

The prosecutor then asked her if she had talked to her brother the night before her trial testimony, but she remembered talking only with Sharon Francis. The prosecutor then asked her if appellant (who was in jail) was also on the phone with them, and she admitted that he was. She first said that her brother asked her not to be a witness and then corrected her statement to say that he told her she did not have to take the stand. She claimed that her brother had not told her to run to Dallas; she had told him that she was going to run to Dallas because she did not want to testify. The prosecutor reminded her that calls from the jail were recorded; her testimony then became less evasive.

Marquita remembered that appellant came and told her when the police towed Brittany's car away. She "assumed" that event was very important to him for some reason. Marquita then testified as follows:

Q. Okay. Now, at that point in time, he told you, Big Sis, I'm gone, y'all ain't never going to see me again?

A. Yes.

Q. And he told you that, right?

A. Yes.

Q. And he started to – you started to cry and you asked him, what's going on; didn't you?

A. Yes.

Q. And then he responded, you know what's going on Big Sis, for Raheem – for what Raheem is going down for, they fixin' to come and get me; didn't he tell you that?

A. Yes.

Q. Okay. And then you told him, Man [his nickname], you done f----d up, you f----d up bad, what did you do, what did you and Raheem do, why did you go f--k with him like that anyway; didn't you say that?

A. Yes.

Q. And then, he said, f--k that, that s--t is over with, I'm gone?

A. Yes.

Q. And that was in October of '08 he told you that?

A. Yeah.

Marquita claimed that she did not know where appellant went, only that he left Waco because they were taking Brittany's car and because he had taken Raheem to a hospital in Dallas to have his foot treated by a doctor.

An officer with the Dallas Police Department, Andrew Palmer, testified that he was on patrol on February 12, 2009, when he received a dispatch call to go to an apartment at 6500 South Cockrell Hill Road. A neighbor had heard people fighting above him and called in. Officer Palmer and two other Dallas police officers went to the address. When they entered the upstairs apartment, six people were there. They could hear a male and female arguing in the bedroom. When the couple saw the officers, the male ran into the bathroom. The man told them that his name was Stacey Robinson, and the officers arrested him for possession of marihuana. As a result of his being fingerprinted at the jail, the officers learned that his name was Manuel Robinson and that there was an arrest warrant out of Waco for him for murder.

Brittany Nicole Hamilton said that she had known Raheem for four or five years and that she dated appellant for about two months. She also said that, on the night of June 1, 2008, she, Raheem, Inky, Marquita, appellant, and Pudding were at Pudding's house. She was smoking marihuana with Marquita and Inky. Raheem and appellant were in another room "messing" with a long, black rifle and a silver and black handgun. Raheem had the rifle, and appellant had the handgun. They were wiping them down with a white rag. She identified State's Exhibit No. 118 as a picture of a rifle that looked like the rifle that Raheem had that night.

6

She said that, ultimately, everyone went outside. An aunt pulled up. She was speaking "churchly" to them, and they were trying to hide the gun from her by sitting in front of the gun. When appellant asked Brittany to go with Marquita, Brittany went to her car to get her son's car seat out of the trunk and saw a box of long, skinny bullets in the trunk. Her son was about seven months old at the time. She did not ask appellant why he wanted her car. Brittany testified that appellant and Raheem left first, and then she and Marquita left.

Marquita got some gas and drove around, and they ended up at a man named Ernest's house on 17th Street where Marquita's car broke down. Marquita called appellant, but there was no answer; she then called her husband, Inky. Inky showed up and went to get some gas. While Inky was gone, appellant drove up in Brittany's car; he was alone. When appellant got out of the car, he looked worried.

Brittany asked appellant what was wrong, but he just walked over to his sister. Brittany could not hear what Marquita and appellant were saying, but she saw Marquita start crying and hugging appellant and a "tear roll down his eye." When appellant came over to her, she asked what happened to Raheem. His answer was "Raheem was ducked off," meaning he was hiding. Appellant said they needed to take some pills to Raheem for pain because he shot himself in the foot.

Appellant located some pills, and they went to Jenequehua Scott's apartment at the Lake Shore North Apartments. When they arrived there, Brittany noticed some blood on the passenger seat floorboard and saw Raheem's right shoe on the backseat floorboard. The shoe had a hole in it "by the pinky toe." When she asked if it was Raheem's shoe, appellant just threw the shoe in the dumpster at the apartment complex. She also noticed a trail of blood outside and inside Jenequehua's apartment.

After leaving the apartment, she took appellant to his aunt's house, and she went to her grandmother's home where she lived. She testified that, when appellant and Raheem left Pudding's house, appellant was wearing a black, long sleeve shirt and a navy or black cap. When he showed up at 17th Street, he was wearing a gray T-shirt and some black gym shorts. When Brittany dropped him off at his aunt's, appellant took the clothes he had worn earlier that night from the trunk of her car.

The next time she was with appellant and Raheem, Raheem said that he had to see someone about his foot. They took Brittany's car, but she insisted that she go with them because

7

she could tell something was wrong but did not know what was wrong, only that there was blood in her car. During the drive to Dallas, appellant used her phone to call someone. He asked that person about a hospital in Dallas and "a park that was where a lot of stuff went on, shootings, or whatever, so that Raheem would have something to tell the police once he got to the hospital." Brittany testified that Raheem and appellant decided that Raheem would say that he was walking through the park, that he had an altercation with someone, that they dropped a gun, and that it shot him in the foot.

While Raheem was in the hospital, appellant and Brittany went outside. When she asked him what really had happened, appellant told her that he had shot Raheem in the foot. He said that they had cut the man's lights and then waited in the grass for the man to come outside. When he did, they struggled over the gun and that is how Raheem got shot in his foot, "and then eventually the gun went off and shot the man." Brittany said her reaction was that they must have been trying to rob him.

Brittany testified that a week or two before that night, Raheem and appellant were saying they needed to "hit a lick." She explained that meant they needed to go rob somebody for their money or belongings. When asked why they went to that particular house, Brittany said that, once she saw a photo of the house, she remembered that the three of them had driven by the house twice within a week or two before the man was shot. "And they were pointing at a shed believing that he had money or marijuana or something in it."

Brittany said that, after the conversation at the hospital and reading newspaper accounts, she became worried that she might be in trouble because they used her car. She said appellant assured her that she could not get in trouble because they parked the car around the corner in the alley; also, the newspaper articles said the car was silver in color. Brittany identified a photograph of her car and described it as being a champagne color, but she stated that at night it appeared gray in color. She admitted that the next morning she used soap and water to clean the blood from her car.

Brittany said that Raheem used his real name in Dallas but gave the address of her grandmother for his address. Her grandmother threw letters from the hospital away; however, Brittany picked up Raheem's mail at her grandmother's house one day and threw the letters in the trunk of her car. They were Raheem's hospital records and were introduced as exhibits. The

8

envelopes confirmed that the letters were mailed to Raheem at her grandmother's address and that he had a wound in his foot.

Brittany testified that Detective January came to her grandmother's house to impound her car and that she subsequently wrote a statement about what had happened. During cross-examination, she said that Jeremy Standifer (who was in federal prison) would tell her about the street talk concerning that night, but she told him she did not know anything. But after her car was impounded, she told Jeremy what had happened. Brittany claimed that, at first, she did not know that Jeremy could use the information to try and help himself, but later, Jeremy told her that he could.

Detective January testified that the first break in the case came when he received a fax from CODIS that the DNA profile of blood at the scene matched the DNA profile of Raheem. He obtained an arrest warrant for Raheem and then, within a week, obtained a search warrant to obtain Raheem's DNA for confirmation. When he saw Raheem's right foot, it had gangrene from a large caliber wound between his last toe and the toe next to it, which matched Brittany's testimony that it was near his pinky toe. He testified that, after talking with Jeremy, he located Brittany on October 20, 2008, and impounded her Nissan Altima.

Brittany came in to see Detective January at 4:00 p.m. that day and told him what she knew about the case. He verified her information and obtained an arrest warrant for appellant the day after he impounded her car. He found the medical records for Raheem from the Methodist Charlton Medical Center in Dallas in the trunk. Detective January said that Jenequehua also came in for a statement. He went to her apartment twice and could see there were discolored patches on her carpet from the front door to her bedroom. Jenequehua told him that she had used a chemical and bleach to remove the blood. The police were unable to gather blood DNA from the carpet because of the cleaning. At that time, it was some four and one-half months after the murder.

Detective January said that he spoke with appellant's sister, Marquita, two days after impounding Brittany's car. He said that, at that time, Marquita told him several times that Raheem and appellant left in Brittany's car first, before she and Brittany left from Pudding's house that night. Detective January said that Marquita's story at the time of the interview agreed with Brittany's and that he had recorded the conversation on a seventy-minute video.

9

During cross-examination, Detective January was asked if he had been told by a woman named Stacey that a man named Darrell High (known as Fifth Ward) had told her he was with Raheem that night. Detective January said that the woman had spoken to another officer but that he had tried to contact her. Detective January then testified that Stacey was a documented prostitute in Waco and that High was her pimp and had three or four prostitutes working for him. One of them gave Detective January information as to a motive Stacey had for trying to have High implicated in the murder: Stacey owed High money.

Detective January acknowledged that Jeremy Standifer had sent a letter to the federal prosecutor concerning what Brittany had said to him. Contrary to Brittany's memory, Detective January said he contacted Jeremy about a week before he impounded Brittany's car. He was aware that Jeremy might be using the information to try and reduce his federal sentence, but he had not made any request to the federal prosecutor and did not know whether Jeremy helped himself or not.

Detective January testified in summary that he found what Jeremy told him to be credible and that his statement and the statements from Brittany, Marquita, and Raheem all agreed.

Appellant did not present any evidence. In appellant's opening statement, he had conceded that the victim had been murdered, but he asserted that he was not at the victim's house that night. He suggested that appellant had broken his relationship with Brittany and that her testimony would be from a bitter and scorned woman. Appellant's closing argument attacked the credibility of Brittany, suggesting that she and Jeremy tried to frame appellant to help Jeremy obtain a reduction on his federal prison sentence. Appellant referred to testimony by Brittany where she said that she and Jeremy were at one time planning to be married and insisted that Jeremy was central to this case. Appellant also suggested that Detective January was overworked and that he did not sufficiently investigate the possibility that Fifth Ward was with Raheem that night.

The jury rejected appellant's argument and found him guilty of capital murder.

*Standard of Review*

We will review the sufficiency of the evidence under the currently applicable legal sufficiency standard of review. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

The standard of review for an appellate court in evaluating the legal sufficiency of the evidence is to determine whether any rational finder of fact could have found the existence of the elements of the offense beyond a reasonable doubt after viewing all of the evidence in a light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The appellate court's duty is not to sit as a thirteenth juror reweighing the evidence or deciding whether it believes the evidence established the elements in question beyond a reasonable doubt. *Blankenship v. State*, 780 S.W.2d 198, 206–07 (Tex. Crim. App. 1988).

Under the above standards, all evidence, including circumstantial evidence, is considered. *Nguyen v. State*, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001, pet. ref'd). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The legal sufficiency test must be applied to the application paragraph in a hypothetically correct jury charge. *Fuller v. State*, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

*Analysis*

In appellant's first two issues, he challenges the sufficiency of the evidence to establish that appellant committed capital murder, specifically that the evidence was insufficient to show that he intended to commit a robbery, and to establish that appellant intended to cause the death of the victim.

In Texas, a person commits the offense of capital murder when he intentionally causes the death of an individual during the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2011). Section 29.02 provides that a person commits a robbery if, in the course of committing theft, and with the intent to obtain or maintain control of property, he intentionally, knowingly, or recklessly causes bodily injury to another. *Id.* § 29.02 (West 2011). Under the law of parties in Section 7.01(a), a person may be convicted as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. *Id.* § 7.01(a). Under Section 7.02(b), a person may be found guilty of capital murder as a party if the following conditions are met:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense

was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b). Thus, if the evidence is sufficient to support appellant's conviction as a party, we must uphold the conviction.

Brittany testified that, during the evening before the murder, she saw Raheem with a long, black rifle and appellant with a silver and black handgun. She also found a box of long bullets in the trunk of her car. While Brittany was with them within a week or two of the murder, appellant and Raheem had said they needed to "hit a lick" and, as they were driving by the victim's house, discussed there being marihuana and money at the victim's residence. She was with them in her car on at least two occasions when the remarks were made. In taking weapons with them to the victim's house, Raheem and appellant should have anticipated the result that occurred.

Brittany testified that appellant was wearing dark-colored clothing when he left Pudding's house with Raheem but that he had changed when she next saw him at Marquita's car. He later took the dark-colored clothing out of her car trunk when she dropped him off at his aunt's house.

When appellant came up alone to where Marquita's car had broken down, appellant appeared worried. Appellant first had an emotional talk with his sister and then told Brittany that Raheem was hiding but needed some pills for pain because he had been shot in the foot. Later, at the Dallas hospital, appellant told Brittany how they had cut the power to the victim's house and laid in wait for him and how Raheem got shot in the foot during a struggle over the weapon. Brittany described her reaction at that point to the jury: they must have been trying to rob the man. Brittany voiced her worry that she might be implicated, but appellant assured her that he had parked her car around the corner. When the police came to impound her car, she knew why they had come.

Detective January testified that the statements he had taken from Brittany, Marquita, and Raheem all agreed. Marquita told him that appellant left Waco when Brittany's car was impounded in October 2008. Marquita's testimony at trial, quoted earlier, was also that appellant told her then that he was leaving because he was about to be arrested "for what Raheem is going down for." Dallas police officers arrested him in February 2009. He gave them a false name,

but after his arrest for marihuana possession, they learned his correct name and that there was an arrest warrant for him for murder.

The evidence was legally sufficient for the jury to draw the same inference that Brittany had: Raheem and appellant had planned to rob the victim and went there that night to carry out their plan.

Because of the law of parties, the State had only to prove that either Raheem or appellant, in firing the fatal shots, had the intent to murder the victim. Intentional murder is a "result of conduct" offense. *Martinez v. State*, 763 S.W.2d 413, 419 (Tex. Crim. App. 1988); *Ybarra v. State*, 890 S.W.2d 98, 106 (Tex. App.—San Antonio 1994, pet. ref'd). Although there apparently was a struggle between the victim and his assailants, there was evidence that showed his death was not unintentional.

The victim's son, Jameson, testified that, as he looked through the back-door screen, he saw flashes of light from a semiautomatic weapon that was near the back of the beauty shop, some distance from where the victim was found at the corner of their house. Officer Carpenter testified that the .223 casings were found approximately four or five feet from where the victim lay. Their testimony suggests that the shots were intentionally fired at the victim after a struggle.

The medical examiner, Dr. Dyer, testified that there were four gunshot wounds in the victim's body. Three were sharply downward in their angle; the fourth shot came out the lateral backside of the right thigh. The victim had soot on his left forearm, indicating that his arm got in the way of a gunshot. In addition to the four gunshot wounds in the victim, there was a .45 caliber slug lodged in the corner of the house, indicating that the person firing the .45 caliber weapon was aiming at the victim. Dr. Dyer testified that, looking at the entrance wounds, he could not tell the caliber of the gunshots; therefore, the wounds may have been from either weapon.

Although the victim's body had four gunshot wounds, the wall near him had a bullet, and Raheem's foot received a gunshot wound, only three .223 casings and one .45 casing were found. At least six shots were fired that night. From the angle of the gunshot wounds, the number of the shots fired, and Jameson's and Officer Carpenter's testimony as to where some of the shots were fired from, the evidence was sufficient to support the jury's conclusion that the murder of the victim was intentional. Appellant's first two issues are overruled.

13

In appellant's third issue, he contends that the trial court committed reversible error in submitting instructions in the abstract portion of the charge that allowed the jury to convict appellant if he intentionally or knowingly engaged in conduct that resulted in the death of the victim instead of requiring the jury to find that appellant had the specific intent to cause the victim's death. In its charge, the trial court defined intentionally and knowingly as follows:

> A person acts intentionally, or with intent, with respect to the nature of his conduct, or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct, or to circumstances surrounding his conduct, or to a result of his conduct, when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Appellate review of alleged error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred; if so, we must then evaluate whether sufficient harm resulted from the error to require reversal. If there is error in the court's charge but appellant did not object to it at trial, we must decide if egregious harm has occurred, i.e., whether the error caused such harm that appellant did not have a fair and impartial trial. TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Appellant did not object to the charge in this case.

In *Cook v. State*, 884 S.W.2d 485 (Tex. Crim. App. 1994), the court held that it was error for the trial court not to limit the definitions of the culpable mental states even in the abstract portion of the court's charge. The defendant in *Cook* was charged with intentional murder pursuant to Section 19.02(a)(1) and was convicted by a jury of the lesser included offense of voluntary manslaughter. The defendant objected to the charge at trial because the definitions of intentionally and knowingly were not limited to the result of defendant's conduct. The Court of Criminal Appeals agreed and reversed and remanded the case. In his concurring opinion, Judge Maloney observed that understanding "conduct elements" made sense only in the context of an "element analysis" rather than an "offense analysis." He agreed that in the case of a "result of conduct offense," such as murder, the definition of "intentionally and knowingly" must be

14

limited to the result of conduct language. But Judge Maloney pointed out that problems may arise because not all offenses are characterized by a single conduct element. He specifically mentioned that capital murder is usually a combination of offenses (e.g., intentional murder plus robbery).

The problem in this case is that it was a capital murder case that involved intentional murder plus an attempt to commit robbery. It also involved the law of parties. Because of the robbery aspect, the trial court gave the broader definitions of intentionally and knowingly, and the court also defined reckless. The charge defined when a person is criminally responsible as a party to an offense. As the court of appeals explained in *Wood v. State*, 4 S.W.3d 85 (Tex. App.—Fort Worth 1999, pet. ref'd), a party may be held criminally responsible for the acts of another under Section 7.02(b) even though that party did not intend for the act to occur as a result of his conduct.

We will assume, without deciding, that the trial court erred in its charge because we find that no egregious harm occurred even if there was error. When conducting a harm analysis, the reviewing court looks at (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Bailey v. State*, 867 S.W.2d 42 (Tex. Crim. App. 1993); *Ybarra*, 890 S.W.2d at 106.

The second and third paragraphs of the trial court's charge stated that "a person commits the offense of Murder when he intentionally or knowingly causes the death of an individual" and a "person commits Capital Murder when such person intentionally commits the murder in the course of committing or attempting to commit the offense of robbery." The trial court then defined the elements of robbery, which included an "intent to obtain or maintain control of property" and "intentionally, knowingly, or recklessly caus[ing] bodily injury to another." The trial court also correctly instructed the jury on the law of parties.

In the opening statement and closing argument of appellant's counsel, he recognized that the victim had been murdered. Appellant's defense was that he was not present at the victim's residence that night and that there was no physical evidence that he was. Instead, defense counsel attacked Brittany's credibility and suggested that Jeremy and Brittany wanted to frame appellant to help Jeremy reduce his sentence. Appellant's theory was that Fifth Ward was the person with Raheem that night but that Detective January had insufficient time to pursue that

15

lead.  The jury rejected appellant's argument and believed Brittany's testimony, which was buttressed by the testimony of other State witnesses and the forensic evidence.  Even if the trial court erred in its charge, we find there was no reversible error under the criteria of *Almanza*. Appellant's third issue is overruled.

As stated at the outset, the State has conceded appellant's fourth issue.

*This Court's Ruling*

The trial court's judgment is modified to delete the assessment of costs of counsel against appellant.  As modified, the trial court's judgment is affirmed.


TERRY McCALL

JUSTICE


December 22, 2011

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of:  Wright, C.J.,
McCall, J., and Kalenak, J.